**KAPLAN HECKER & FINK LLP**

350 FIFTH AVENUE | 63RD FLOOR
NEW YORK, NEW YORK 10118

1050 K STREET NW | SUITE 1040
WASHINGTON, DC 20001

TEL (212) 763-0883 | FAX (212) 564-0883

WWW.KAPLANHECKER.COM

DIRECT DIAL          212.763.0889
DIRECT EMAIL        shecker@kaplanhecker.com

October 27, 2022

**BY ECF**

The Honorable John G. Koeltl
United States District Judge
Southern District of New York
500 Pearl Street
New York, NY 10007

**SENTENCING MEMORANDUM**
**<u>United States v. Arthur Hayes et al. (Greg Dwyer), 20 Cr. 500 (JGK)</u>**

Dear Judge Koeltl:

      We respectfully submit this memorandum on behalf of Greg Dwyer ahead of his sentencing on November 10.  Earlier this year, this Court sentenced the three founders and co-owners of Mr. Dwyer's employer, BitMEX, to periods of probation ranging from eighteen to thirty months for their leading roles in causing BitMEX—their online cryptocurrency derivatives trading platform—not to register with U.S. regulators and implement a required anti-money laundering ("AML") program.[1]

      Mr. Dwyer, an Australian citizen and BitMEX employee with no meaningful ownership stake in the company, had a broad commercial portfolio under the title of Head of Business Development.  He never served in any compliance, legal, or regulatory role at BitMEX or in any of his previous work as a derivatives trader at a German bank and as an Asia-based consultant to financial services firms.  In this respect, Mr. Dwyer's conviction for causing BitMEX to violate the Bank Secrecy Act ("BSA")—involving an individual defendant who neither owned nor controlled the offending firm, nor whose employment duties included ensuring its compliance with U.S. regulations—may well be the first of its kind.  Mr. Dwyer's culpability arises from his coming to learn, during his employment, that U.S. residents traded on BitMEX's platform despite the company's policy against serving such customers, and from his continued participation in BitMEX's operations without taking any steps to encourage the company to adopt an AML program as required by U.S. law.  This liability is real—Mr. Dwyer pled guilty to a single count of violating the BSA—but it is meaningfully distinct from the culpability of the

---

[1] The company's first founder, Arthur Hayes, is also serving six months of home detention.

company's three founding owners, and Mr. Dwyer's sentence should reflect the categorically different context in which his conduct took place.

We therefore respectfully request that the Court sentence Mr. Dwyer to payment of the considerable stipulated $150,000 criminal fine, in recognition of his acceptance of the powerful sanction of a felony conviction and his status as an employee whose duties did not include ensuring his foreign employer's compliance with U.S. law.  *See* 18 U.S.C. § 3551(b) (authorizing sentences of either "a term of imprisonment," "a term of probation," *or* "a fine").

### I.    Factual Background

#### A. Mr. Dwyer's Early Life

Greg Dwyer will be 39 years old at his sentencing next month.  He was 32 years old when he joined BitMEX as a full-time employee, more than a year after its founding.  When Mr. Dwyer began working from home as a consultant to BitMEX in the fall of 2015, it was his first time living and working in the United States.  He was born in Sydney, Australia, in May 1983, in comfortable but relatively modest circumstances.  His parents, Dr. Phillip Dwyer, a dermatologist with a small family practice, and the late Merilyn Cresswell, a nurse, instilled in their children the commitments to faith, hard work, and service that had been hallmarks of their own upbringings.  Ex. B at 1–2.[2]  The family often spent Saturday nights volunteering at a soup kitchen in inner Sydney, and as a high school student, Mr. Dwyer was recognized for his extraordinary community involvement with an award marking his eighteen months of volunteer service to elderly and disabled communities across Sydney.  *See id*. at 2.

Mr. Dwyer's work ethic has been apparent from a young age.  His father's letter describes Greg's commitment not just to his schooling—where he routinely excelled academically—but also to athletics and a suite of extracurricular activities ranging from building computers to mastering chess.  *See id*.  Despite his family's relatively comfortable circumstances, at Sydney University, Mr. Dwyer combined a grueling courseload in dual degrees with a range of modest jobs to help defray his living expenses, including washing dishes at local restaurants.  *Id*.

At university, Mr. Dwyer experienced one of the first significant setbacks of his young life when one of his closest friends was killed in a car accident.  The tragedy shook Mr. Dwyer; he began spending hours a day engrossed in video games, and for the first time in his life, failed classes at school.  *Id*. at 2.  Ultimately, however, the dark ordeal illustrated Mr. Dwyer's ability to right himself after going far off course: he became a nationally reputable player of this particular game; formed a gaming club at university in honor of his late friend; and shortly regained his focus on—and excelled once again in—his studies.  Not long later, Mr. Dwyer— still an undergraduate—was invited to serve as a lecturer and head tutor in several subjects, and was asked to serve his college's dean as a research assistant.  *Id* at 2–3.  After a final year of

---

[2] "Ex. __" refers to letters of support that are attached to this submission.  For reasons of personal privacy and security, we have redacted certain private and personal information from this submission and certain of its attached letters.

study, Sydney University offered Mr. Dwyer a scholarship for an additional year of study where he wrote a first-class honors thesis on information theory in financial markets. *Id.* at 3.

      B.  <u>Mr. Dwyer Begins His Career</u> ███████████

The temporary academic setback occasioned by the loss of his close friend left Mr. Dwyer with an uneven academic transcript. At first, most of the banks and financial firms to which he applied for internships refused to entertain Mr. Dwyer's inquiries. But with characteristic perseverance, Mr. Dwyer secured a sought-after internship with Deutsche Bank in Singapore—and was one of only a few interns to be offered full-time employment. *See id.* at 3.

At Deutsche Bank, Mr. Dwyer impressed his peers with his intellect, diligence, and unusually affable spirit on a trading floor typically dominated by strong personalities. One fellow junior trader, Andrew Rizkalla, recalls Mr. Dwyer as "standing out from the other juniors on the floor," and as someone who "wasn't afraid to ask questions, take on more than his share of responsibility, and take initiative on new projects all the while being a very likable character." Ex. D at 1. Mr. Dwyer so impressed Mr. Rizkalla in their early years together at Deutsche Bank that, several years later, Mr. Rizkalla went to work for Mr. Dwyer, reporting to his former peer as a member of BitMEX's Institutional Sales team. *Id.*

 The considerable time Mr. Dwyer was away from work, during a period when global banks were laying off large numbers of their workforces in the receding tide of the global financial crisis, culminated in Mr. Dwyer's role being made redundant at Deutsche Bank in Hong Kong.

Like with previous setbacks, Mr. Dwyer quickly put himself back on course. For work, he offered his expertise on trading strategies as a consultant to financial services firms. But Mr. Dwyer's focus expanded beyond the professional sphere. After a brief period living in Hong Kong for Deutsche Bank, Mr. Dwyer ████████████████████████████████████
████████████████████████████████████████████████████████████████████████████



### C. Mr. Dwyer Comes to Work at BitMEX

In 2015, Mr. Dwyer was living in New York ▮▮▮▮ and searching for trading jobs for himself. He soon heard from an old friend from his Deutsche Bank days, Arthur Hayes, who offered Mr. Dwyer a job at his startup cryptocurrency derivatives trading platform, BitMEX. The role would initially be as a consultant assisting the platform's market-making activities, and "the pay was extremely modest for Greg given his prior education and experience." Ex. A at 2. But Mr. Dwyer, interested in applying his quantitative market-making and trading skills to the nascent cryptocurrency industry, ▮▮▮▮ agreed to take the job.

Mr. Hayes and Mr. Dwyer had met as young traders at Deutsche Bank. Mr. Hayes reached out to Mr. Dwyer in the fall of 2015 because BitMEX needed someone who could help run its market-making function, a task that Mr. Hayes was unsustainably handling himself over the course of nearly 24-hour workdays. By the time Mr. Dwyer became a BitMEX consultant in October 2015 at an annual base salary of $80,000, the three founders had already made decisions "to structure BitMEX without AML or KYC," *see* Draft PSR ¶ 16, including by incorporating the company in the Seychelles in 2014, *id.*, the year before Mr. Hayes first reached out to Mr. Dwyer. Mr. Dwyer did not become a full-time BitMEX employee until nearly three years later, in 2018, shortly before the company relocated him to Bermuda in early 2019.

Mr. Dwyer's daily duties evolved over time, but at its core, his job was to execute plays called by Mr. Hayes and, later, a series of intermediate managers layered between Mr. Dwyer and BitMEX's senior management. In January 2016, Mr. Hayes emailed a group of colleagues, "We added a new member to the team. Greg Dwyer will be assisting me on the market making, business development, and customer support areas in the North American / European hours." Mr. Dwyer would not even meet co-defendant Sam Reed until the middle of 2016, and co-defendant Ben Delo until the middle of 2017. And he remained a consultant to BitMEX for years, only becoming a full-time employee (and working from a rented WeWork space rather than ▮▮▮▮) in 2018.

Mr. Dwyer oversaw BitMEX's market making desk from his initial onboarding in late 2015 until the market-making role, which then entailed supervising a team of traders that Mr. Dwyer had hired and built, was given to a new hire in 2018. The role drew on Mr. Dwyer's trading background and expertise, and involved ensuring liquidity for the platform's users and managing its own financial risk—paradigmatic trading functions that had nothing to do with regulatory or compliance duties.

The bulk of Mr. Dwyer's work at BitMEX ultimately settled around business development, customer support, and marketing, and he was eventually given the title of Head of Business Development. The business development function evolved to include a focus on

BitMEX's competitive place in the growing marketplace for cryptocurrency derivatives exchanges, strategic partnerships with other companies, and relationships with BitMEX's growing base of global institutional clients. The customer support role involved oversight of a team of personnel who monitored and responded to customer inquiries. For some part of the period relevant to this case, BitMEX hired a dedicated head of customer support, who took over the role from Mr. Dwyer before Mr. Dwyer was told to step back in when the short-lived employee was terminated. While Mr. Dwyer led the customer support function for a time, he did so clearly as a deputy for the founders—and only ever acted at their direction. Mr. Dwyer's marketing responsibilities were similarly intermittent and at the direction of BitMEX's founders, at least one of whom—Mr. Hayes—performed many of the highest-impact marketing functions himself as the very public face of the growing firm. Mr. Dwyer focused on communications, building out a team of professionals and handling certain responsibilities directly under Mr. Hayes's supervision, before and after the company hired and shortly thereafter fired a head of marketing.

Despite the Draft PSR's assertion that Mr. Dwyer "generally controlled the company's operations during United States business hours," Draft PSR ¶ 66, even the government concedes that he "did not control" those operations, *see* Oct. 25, 2022 Ltr. at 1. While Mr. Dwyer participated in BitMEX's operations (like many dozens of other employees), he was never the company's chief operating officer—a title held initially by Mr. Delo, *see* Draft PSR ¶ 24, and after 2018 by Angelina Kwan, *see* Hayes Sent'g Mem., ECF 327 at 9 & n.4—or anything comparably influential. During Mr. Dwyer's tenure at BitMEX, the company hired senior executives with responsibility for operations and regulatory and legal compliance. In October 2018, BitMEX hired Ms. Kwan, a former head of regulatory compliance at Hong Kong's largest securities and derivatives exchange, to serve as the company's COO and "[take] over the day-to-day management of BitMEX." Hayes Sent'g Mem., ECF 327 at 9 & n.4. In March 2019, BitMEX hired Vivien Khoo, a 19-year veteran of Goldman Sachs's compliance department, to serve as deputy COO "with a mandate to develop a Global Regulatory Affairs function." *Id.* n.9. And in September 2019, BitMEX hired its third general counsel, Derek Gobel, from the legal department of a global bank. *Id.*

Mr. Dwyer was respected by his fellow employees and customers alike. One former member of BitMEX's customer support team was struck by the care that Mr. Dwyer took with his non-traditional job application, as he was considering leaving a legal career to enter the cryptocurrency space. *See* Ex. F at 1. This former colleague said it "was an easy decision to go work for Greg," and added that BitMEX's graduate program—which Mr. Dwyer helped create and run—"was truly a life-changing experience." *Id.* Mr. Dwyer spent weeks to develop a curriculum on financial derivatives, and created a program in which junior BitMEX employees went through four rotations on various desks. He also spent countless hours on the program's logistics, ensuring its participants had appropriate travel documents and making sure local managers were prepared to implement the global program he had designed.

Mr. Dwyer's positive influence was also felt outside of the company, where he played a key role in liaising with well-established foreign trading firms interested in participating in the cryptocurrency markets but looking for reassurances that BitMEX was a secure and competent platform. Mr. Dwyer's market-making experience, commercial savvy, and genuine trustworthiness often made the case. The Australian head of an offshore trading firm wrote that

KAPLAN HECKER & FINK LLP

"the trust that traders had in Greg and the team he led was a large reason for BitMEX's remarkable commercial success," and added that "Greg's expertise and professionalism meant that reputable trading firms from traditional finance chose to deposit their funds and trade on BitMEX as opposed to the other exchanges." Ex. C at 1.

### D. Mr. Dwyer's Liability for BitMEX's BSA Violation

When he first joined the firm in late 2015, Mr. Dwyer understood that a decision had been made before his arrival that BitMEX would not implement an AML or KYC program. He also understood that BitMEX had a policy against serving U.S. customers in order to maintain its avoidance of U.S. regulatory obligations. But in the course of his business development, customer support, and marketing duties, Mr. Dwyer came to learn that even though BitMEX had a policy and certain controls in place to prohibit United States residents from trading on the platform, there were in fact United States residents trading on the BitMEX platform. For example, as part of his customer support role, Mr. Dwyer worked to remove United States residents from the platform when he became aware of them. Despite this awareness, Mr. Dwyer continued to participate in BitMEX's operations and did not take any steps to encourage the company or its owners to adopt a KYC or AML program, as was required by U.S. law.

The government unsealed an indictment in October 2020 charging Messrs. Hayes, Delo, Reed, and Dwyer with violating and conspiring to violate the BSA. Mr. Dwyer consented to his extradition from Bermuda, and arrived here in September 2021. In Count One of the Indictment, the government charged the three founders and Mr. Dwyer with violating the BSA by causing BitMEX to fail to implement a legally required AML program, including KYC procedures, in violation of 31 U.S.C. §§ 5318(h)(1) and (*l*) and 5322(a) and (c); 31 C.F.R. §§ 1026.210 and 1026.220; and 18 U.S.C. § 2. The founders entered guilty pleas to Count One in February and March 2022.

On August 8, 2022, Mr. Dwyer pled guilty to Count One and agreed, among other things, to pay a stipulated fine of $150,000—a significant multiple over the Guidelines fine range for the offense of $1,000 to $9,500, *see* Draft PSR ¶ 120 (citing USSG § 5E1.2(c)(3)). He accepts responsibility for his conduct and deeply regrets the decisions and inaction that led to his violation of law.

### E. Mr. Dwyer's Future ▮

Mr. Dwyer was an unquestionably devoted employee; his efforts were recognized by colleagues and customers alike as integral to BitMEX's legitimate commercial successes. *See, e.g.*, Ex. F (letter from Australian market participant describing Mr. Dwyer's singular role in persuading his firm and others in "traditional finance" to do business on BitMEX). And while Mr. Dwyer was paid well during his later years of employment, his several years of work at below-market compensation and his lack of a meaningful ownership stake in the company mean that, unlike the founders, he is unable to retire or dedicate himself to philanthropy and must continue working ▮

KAPLAN HECKER & FINK LLP

7

**II.  Mr. Dwyer Should Be Sentenced to Pay a Fine**

  A.  <u>Applicable Law</u>

While the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range," *Peugh v. United States*, 569 U.S. 530, 536 (2013), the resulting range is "not to be presumed reasonable." *Nelson v. United States*, 555 U.S. 350, 352 (2009). Rather, the Court must make an "individualized assessment," *Gall v. United States*, 552 U.S. 38, 50 (2007), to determine a sentence that is "sufficient, but not greater than necessary" to achieve the purposes of the sentencing law as applied uniquely to Mr. Dwyer. *See* 18 U.S.C. § 3553(a) (providing relevant factors). These considerations evaluate the circumstances of the offense in view of the characteristics of the defendant, and weigh the relative seriousness of the violation alongside the needed degree of deterrence and public protection in order to "provide just punishment." *See id.*

  B.  <u>Application of the Sentencing Guidelines</u>

The parties have entered into a plea agreement with a stipulated Sentencing Guidelines offense level of six. In tandem with Mr. Dwyer's lack of any criminal history, this results in an advisory sentencing range of zero to six months (Zone A)—but no sentence of imprisonment is required. *See* USSG § 5C1.1(b)).

Under the applicable circumstances, the Sentencing Guidelines "authorize, but do not require, a sentence of probation." *See id.* § 5B1.1 cmt. n.1(A). Should the Court impose a term of probation—a "substantial restriction of freedom," *Gall*, 552 U.S. at 44, that "metes out significant punishment," *United States v. Dokmeci*, 2016 WL 915185, at *16 n.79 (E.D.N.Y. Mar. 9, 2016)—the Court is constrained to impose at least a one-year term. *See* 18 U.S.C. § 3561(c)(1).[3]

  C.  <u>Mr. Dwyer's Consequences to Date</u>

Mr. Dwyer has served nearly fourteen months of pretrial supervision, during which his travel has been limited to parts of New York  and Bermuda (where he was relocated by his employer in early 2019). These restrictions have rendered him unable to visit ███████████████████████████████████████████████████, and curtailed his participation in the global cryptocurrency industry where he hopes to continue working ███████████████.

As part of his plea agreement, Mr. Dwyer has transferred the stipulated $150,000 fine to a United States escrow account ahead of its payment to the government shortly after sentencing.

---

[3] As of the date of this filing, Probation had not yet served its final presentence report ("Final PSR"). On October 14, Mr. Dwyer timely served his objections to Probation's Draft PSR. Because Probation has not yet responded to Mr. Dwyer's objections, this submission references the Draft PSR and discusses certain of Mr. Dwyer's unresolved objections where they are material to the Court's sentencing considerations.

D. <u>The Nature and Circumstances of Mr. Dwyer's Liability for BitMEX's BSA Violation</u>

Mr. Dwyer fully understands the importance of the U.S. financial regulatory regime and the seriousness of his continued participation in his employer's operations while it failed to register with U.S. regulators and implement a required AML program. Several considerations underscore the unique nature and circumstances of Mr. Dwyer's role in the offense.

While Mr. Dwyer's violation was willful, that term of art is a "word of many meanings," often "influenced by its context." *Spies v. United States*, 317 U.S. 492, 497 (1943). In the course of carrying out his duties as an employee of a company whose direction was set by its founding owners, Mr. Dwyer became aware that his employer was failing to abide by its policy of not serving U.S. customers and therefore violating its obligation to implement an AML program under U.S. law. Mr. Dwyer, an Australian citizen employed by a Seychelles-registered company headquartered in Hong Kong, lived and worked in the United States for barely three years ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ He was hired for his experience with financial trading, and tasked initially with overseeing BitMEX's market-making operations. While BitMEX hired senior executives during Mr. Dwyer's tenure who were charged with ensuring its compliance with global laws and regulations—including three general counsel, a chief operating officer who previously ran compliance for a Hong Kong financial exchange, and a deputy COO who previously led regional compliance for Goldman Sachs—Mr. Dwyer's role never included similar responsibilities. *See, e.g.*, Reed Sent'g Mem., ECF 359 at 14 (describing how Mr. Reed "relied on others—*specifically, Mr. Hayes*—to determine what compliance measures should be implemented" at BitMEX) (emphasis added). The Draft PSR generally concurs, stating that "[m]ost important decisions at BitMEX were made by the three Founders together," Draft PSR ¶ 24, while Mr. Dwyer was one of "dozens of additional employees in offices in Hong Kong, San Francisco, New York, and elsewhere." *Id.* The circumstances of this offense are therefore quite distinct from more typical BSA enforcement actions, which tend to be brought against corporate officers whose duties include ensuring a company's compliance with the BSA's vast range of intricate requirements. *See, e.g.*, *U.S. Dept. of Treasury v. Haider*, No. 15-cv-1518, ECF 122 (D. Minn. May 3, 2017) (order settling civil enforcement action brought against MoneyGram's chief compliance officer "for willfully participating in MoneyGram's failure to implement and maintain an effective AML program and to file timely SARs" with $250,000 stipulated fine).

BitMEX's failure to register with U.S. authorities and implement an AML program was the result of decisions made by the company's founders long before Mr. Dwyer joined the organization. *See, e.g.*, Draft PSR ¶ 16 (describing how founders "intended to structure BitMEX without AML or KYC" including by incorporating the company in the Seychelles the year *before* Mr. Dwyer joined). Mr. Hayes and Mr. Delo were the "critical organizers and leaders of the criminal decision not to implement an AML program at BitMEX." Draft PSR ¶ 64. As Mr. Delo's counsel explained to the Court, it "was Arthur Hayes's role" to "set BitMEX's compliance policies." Delo Sent'g Tr., 10:24–25. And the Court determined that Mr. Reed, the third founding owner, was "somewhat less culpable" than his two founding partners, Reed Sent'g Tr., 23:24–24:8, including because his senior position at the company "was not a supervisory role in connection with the criminal activity." *Id.*, 24:5-8. Mr. Dwyer's own culpability sits at an even further remove than the company's least-culpable owner. Unlike

KAPLAN HECKER & FINK LLP

"somewhat less culpable" Mr. Reed, Mr. Dwyer did not have primary responsibility for *any* of the conduct relevant to BitMEX's violation of the BSA. As the government stated at Mr. Delo's sentencing, "Mr. Hayes had the responsibility in marketing and compliance," and "it was [Mr. Delo's] responsibility to improve U.S. user controls in 2018." And while the government "[did] not dispute . . . that Mr. Reed is not as culpable," "as a 30 percent owner, he still had the ability to make the decision about whether or not to implement an AML and KYC program." Reed Sent'g Tr., 19:6-19. It is beyond dispute that Mr. Dwyer, an employee whose title was head of business development, never had Messrs. Hayes and Delo's compliance or user-control responsibilities or Mr. Reed's residual decision-making authority.

The Draft PSR appropriately illustrates Mr. Dwyer's circumscribed role in the offense by devoting the bulk of its recitations to the conduct of the *founders* rather than their employee. *Cf.* Delo Sent'g Tr., 22:20–23:1 (government agreeing that conduct described in Delo PSR was "overwhelmingly, if not exclusively of Mr. Hayes," and that Mr. Hayes's statements "were most often to Mr. Delo and to Mr. Reed," and that "these were decisions they [*i.e.*, the three founders] were making collectively").

Consider the fundamental conduct that the Draft PSR attributes *solely* to the founders. It includes the initial decision to structure BitMEX to avoid compliance with U.S. law in 2014, *see* Draft PSR ¶ 16, before Mr. Dwyer joined the company in late 2015; the "contemporaneous" review of CFTC regulatory actions by "HAYES, DELO and REED" in September 2015, but not by Mr. Dwyer, who that month had just started his job and was focused exclusively on market-making, *see id.* ¶ 17; the withdrawal of hundreds of millions in BitMEX dividends unavailable to employees like Mr. Dwyer, *see id.* ¶ 23; and Mr. Hayes's organization of, and exclusive participation in, a meeting between BitMEX, its outside counsel, and the CFTC, *see id.* ¶ 43.

In contrast, the Draft PSR's description of Mr. Dwyer's conduct underscores that the nature and circumstances of his offense were peripheral to those of the founders to whom he reported. Indeed, much of the Draft PSR describes how Mr. Dwyer was culpably on notice of likely U.S. regulatory violations by means of instructions or updates he received from the founders. For instance, Mr. Delo told Mr. Dwyer that certain risk controls were "not live," and that Mr. Delo was making manual changes to certain controls to exclude U.S. users from their prohibitions. Draft PSR ¶ 37. On the issue of specific U.S. users, Mr. Delo "discussed" the matter with Mr. Dwyer, but "[e]very customer withdrawal from BitMEX required the approval of at least two of the three Founders, so a majority of HAYES, DELO and REED would have approved each of those payments to User-1." *Id.* ¶ 30. For the other specific U.S. user, the Draft PSR describes *Mr. Delo*'s efforts to keep User-2 on the platform. Mr. Dwyer's contribution was to tell a customer support employee that Mr. Dwyer "would be happy [to] block him if he's telling people ways to bypass" controls preventing U.S. access. *Id.* ¶ 31. And while certain efforts to market BitMEX in the United States contributed to Mr. Dwyer's personal liability for the company's BSA violation, the Draft PSR makes clear that even in this area closer to Mr. Dwyer's job duties, the Founders determined the company's actions. *See id.* ¶¶ 38–40 (describing how "BitMEX Intentionally Marketed to U.S. Customers" but focusing almost exclusively on Mr. Hayes and Mr. Delo's conduct).

In reflection of his status as an employee without a material ownership stake, Mr. Dwyer neither sought nor received any personal financial benefit traceable to his offense. *Compare*

Draft PSR ¶ 103 ("Dwyer earns ▮▮▮▮▮") *with id.* ¶ 23 ("Each founder, including HAYES, DELO and REED, withdrew at least $150 million in dividend payments from BitMEX over the period of 2014 to September 2020").[4]  Mr. Dwyer's compensation was not a function of his culpable conduct; his misconduct was not motivated by avarice.  And while Mr. Dwyer's acts and omissions broke with his general duty to comply with the full letter of the law, this is not a case involving the dereliction of any special duty.  Mr. Dwyer is not a lawyer who failed unreasonably to ensure his corporate client's compliance with law, nor a compliance officer who shirked his obligations and let down those who relied on his special expertise.

### E.  The Founders' Uncharged Conduct

The Draft PSR regrettably included a lengthy discussion of prejudicial uncharged conduct attributed almost exclusively to the founders.  *See* Draft PSR ¶¶ 47–59.  Mr. Dwyer did not meaningfully participate in this conduct, and the Court should give it no appreciable weight.  Indeed, this section of the Draft PSR mentions Mr. Dwyer in only three of its thirteen paragraphs, while describing in detail the allegedly relevant uncharged conduct of the three founders.

Most objectionably, the Draft PSR mentions Mr. Dwyer in a discussion of an alleged bank fraud in which Mr. Dwyer did not—even allegedly—materially participate.  These allegations involved accounts associated with Shine Effort, a company formed by Mr. Hayes in August 2014 (before Mr. Dwyer became associated with BitMEX), *see* Draft PSR ¶ 56, "formally sold to BitMEX in July 2015" (also before Mr. Dwyer became associated with BitMEX in the fall of 2015), *id.* ¶ 56, and then sold again by BitMEX to Mr. Delo in August 2015 (before Mr. Dwyer's employment commenced in the fall of 2015), *id.*  The Draft PSR also describes that "HAYES and DELO" (but *not* Mr. Dwyer) "attempted to open a bank account in Shine Effort's name through HSBC Hong Kong, and falsely claimed that it was independent of BitMEX," and describes various misrepresentations by *Mr. Delo*. *Id.* ¶ 57.

The government concedes, as it must, that Mr. Dwyer "himself made no misstatements to others regarding Shine Effort," but nonetheless contends that Mr. Dwyer "was aware of some of" Messrs. Hayes's and Delo's misstatements.  (10/25/2022 Ltr. at 2.)  Mr. Dwyer thoroughly disputes that unrelated, uncharged, and unproven allegation.  Indeed, in support of its position, the government cites a message Mr. Dwyer sent to a BitMEX colleague on this topic, in which Mr. Dwyer relays the position of the counterparty's *legal department*.  Needless to say, individuals plotting illicit schemes to defraud a bank typically do not involve the legal department of an arms-length counterparty.

The Court should not consider the disputed, uncharged allegation that Mr. Dwyer knew that two of his bosses were making misrepresentations regarding Shine Effort, and it certainly should not sentence Mr. Dwyer more harshly because of *other people's* uncharged conduct.  *See* 18 U.S.C. § 3661 ("No limitation shall be placed on the information concerning the background, character, and conduct *of a person convicted of an offense* which a court of the United States

---

[4] Probation has not yet served the Final PSR.  Mr. Dwyer's objections to the Draft PSR, timely served on Probation and the government on October 14, noted that the Draft PSR erroneously stated that Mr. Dwyer's ▮▮▮▮▮ salary was *exclusive* of "additional revenue sharing bonuses."  That figure is *inclusive* of such bonuses.

may receive and consider for the purpose of imposing an appropriate sentence." (emphasis added)).  Mr. Dwyer would have vigorously defended against any such charges had they been filed, not only because he would be factually innocent but also because the charges would depend on the Second Circuit's anomalous right-to-control theory that the Supreme Court may soon reject.  *See United States v. Percoco*, 13 F.4th 158 (2d Cir. 2021), *cert. granted sub nom. Ciminelli v. United States*, No. 21-1170 (Jun. 30, 2022).

F. Mr. Dwyer's History and Characteristics

Mr. Dwyer's history and characteristics are exclusively mitigating factors.  This is his first encounter with the criminal justice system.  And while the acts and omissions giving rise to his liability for BitMEX's BSA violation are undeniably serious, the great bulk of Mr. Dwyer's recognized hard work at BitMEX was not merely lawful but commendable and productive.  He cared deeply for his fellow employees, dedicating time beyond the hours demanded by his primary roles to create and run a program that gave promising junior employees specialized training and resources for advancement.  *See* Ex. F (program alumni's letter).  Mr. Dwyer's thoughtfulness even extended to job applicants who had not yet become his colleagues.  *See id.* (former colleague's description of Mr. Dwyer's concern for his career development during initial job interview).  And his competence, trustworthiness, and professionalism helped BitMEX attract the foreign institutional trading firms that were meaningfully responsible for its global commercial success.  *See* Ex. C (Australian trader's letter describing Mr. Dwyer's role in his firm's decision to trade on BitMEX).

These characteristics are reflected in every stage of Mr. Dwyer's life.  While his relatively modest wealth leaves him unable to make the kind of attention-grabbing charitable contributions that sometimes feature in sentencing submissions, Mr. Dwyer has instead accrued a durable reputation for extraordinary selflessness.  The person who emerges from the accounts of his family, friends, and professional acquaintances is the polar opposite of the potential recidivist for whom restrictive sentences like probation are appropriate.  *See United States v. Knights*, 534 U.S. 112, 119 (2001) (defining the "two primary goals" of probation as "rehabilitation and protecting society from future criminal violations").  Rather than rehabilitation through one or more years of U.S. government supervision, Mr. Dwyer needs only to return to the course his life was on before he became aware of his employer's noncompliance with U.S. law and failed to cause the company to change its course.

G. The Need to Avoid Unwarranted Sentencing Disparities

Sentencing Mr. Dwyer to pay a fine would best meet "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."  18 U.S.C. § 3553(a)(6).

Messrs. Hayes and Delo, the "critical organizers and leaders" of BitMEX's BSA violation as the two founders with responsibility for compliance and U.S.-user controls, were sentenced to twenty-four and thirty months of probation (and, for Mr. Hayes, a period of home detention).  Mr. Reed—who, by means of his thirty percent ownership stake, "still had the ability to make the decision about whether or not to implement an AML and KYC program," Reed

KAPLAN HECKER & FINK LLP

Sent'g. Tr., 19:6-19—was determined to be "somewhat less culpable," *id.* 23:24–24:8, and sentenced to eighteen months of probation.

A sentence of probation would lock the Court and Mr. Dwyer into the statutory one-year minimum term, *see* 18 U.S.C. § 3561(c)(1), a sanction of one-half to two-thirds the punishment imposed on the founders who designed and ordered the implementation of BitMEX's compliance failures. But there is simply no reasonable way to calculate Mr. Dwyer's culpability at such a large fraction of those who owned—literally and figuratively—the decisions that Mr. Dwyer helped to implement.

The defendants' appropriately disparate financial penalties much more accurately approximate their relative culpability. The three founders, who each withdrew more than one hundred million dollars in dividends proportionate to their controlling ownership shares, each paid a $10 million fine. Mr. Dwyer's stipulated fine of $150,000—a considerable amount of personal funds ▓▓▓▓▓▓▓▓▓▓▓▓—is 1.5% of each founder's fine. While this amount still greatly exceeds the founders' relative ownership (each of their 30% stakes is 150 times greater than Mr. Dwyer's 0.2% stake, which included no control rights), it was fairly proportionate to the conduct underlying Mr. Dwyer's plea.

The rest of Mr. Dwyer's sentence should be similarly proportionate to avoid the creation of unwarranted disparities with the founder co-defendants. Indeed, the government's primary argument for a probationary sentence (rather than an exclusively monetary sanction) for Mr. Reed demonstrates why such a sentence would be inappropriate for Mr. Dwyer: probation for the third founder, unlike for Mr. Dwyer, would "properly reflect that he [*i.e.*, Mr. Reed] was also a founder of BitMEX, who earned hundreds of millions of dollars from its criminal conduct." Gov't Sent'g Mem. (Reed), ECF 371 at 7.

H. <u>Providing Just Punishment</u>

The remaining sentencing factors—including the need "to provide just punishment for the offense" in view of its relative seriousness and the necessary degrees of deterrence and public protection—similarly point in favor of a sentence to a weighty fine.

A meaningful monetary sanction and consequences short of probation can adequately "reflect the seriousness of the offense," 18 U.S.C. § 3553(a)(2)(A), including because far more culpable conduct has previously and recently been resolved solely through fines and civil enforcement actions. *See, e.g.*, Financial Crimes Enforcement Network, *FinCEN and Manhattan U.S. Attorney Announce Settlement with Former MoneyGram Executive Thomas E. Haider* (May 4, 2017), https://www.fincen.gov/news/news-releases/fincen-and-manhattan-us-attorney-announce-settlement-former-moneygram-executive (describing chief compliance officer's settlement of BSA claims for $250,000 penalty and three-year ban on performing a compliance function for any money transmitter). And in this case, Mr. Dwyer's $150,000 stipulated fine does more than simply *reflect* the seriousness of the offense: it exceeds, by a factor of *more than fifteen times*, the Guidelines fine range for violations of the BSA. *See* USSG § 5E1.2(c)(3) (setting fine range from $1,000 to $9,500).

KAPLAN HECKER & FINK LLP

13

      As for deterrence, it is difficult to imagine someone in Mr. Dwyer's shoes—a non-U.S. citizen, working in a non-compliance role for a global firm—seeing Mr. Dwyer's experience to date as anything other than a compelling cautionary tale. The notion that a felony conviction, a meaningful monetary penalty, and more than twelve months of pre-sentence government supervision is not enough to "afford adequate deterrence," but that an additional twelve months of restrictive supervision would change Mr. Dwyer's or a potential future offender's calculus, does not withstand scrutiny. And for similar reasons, there is no justifiable nexus between an additional twelve months of restrictive supervision and any need to "protect the public from future crimes" of Mr. Dwyer, who, by reason of his characteristics and experience in this case, will not reoffend.

      As a final consideration, a sentence to pay a fine will avoid needlessly triggering a series of foreign collateral consequences attendant to other jurisdictions' interpretations of the U.S.-law term of art "time served." While there may be little practical difference in the United States between a sentence to "time served and a fine" and a sentence to "a fine," the undersigned are informed that foreign authorities may deem "time served" to be a custodial sentence implicating serious collateral consequences. These foreign bars—which may include the denial of travel permissions—would serve no United States interests but would take a great toll on Mr. Dwyer, interfering with his ability to visit ███████████████ and to pursue work in the global cryptocurrency industry. Avoiding these unnecessary consequences is another reason that we respectfully request the Court sentence Mr. Dwyer to pay the considerable stipulated fine.

### III. Conclusion

Greg Dwyer pleaded guilty to a single count of violating the BSA because he became aware that his employer was serving U.S. customers without implementing a U.S.-approved AML program and did not take adequate steps to cause his employer to correct its noncompliance. For this offense, Mr. Dwyer has been convicted of a felony and paid a considerable penalty. These consequences are sufficient to meet the purposes of sentencing, and more restrictive sanctions would be greater than necessary under the law.

Should the Court impose a probationary sentence, we request that it not exceed the statutory one-year minimum, and that it include conditions permitting international travel and communications with the founders to the extent necessary to discuss the terms of Mr. Dwyer's employment at or formal separation from the company they continue to control.

Respectfully submitted,

*Jenna M. Dabbs*

Jenna M. Dabbs
Sean Hecker
Michael Ferrara
Jeffrey Then
KAPLAN HECKER & FINK LLP
350 Fifth Avenue, 63rd Floor
New York, New York 10118
Telephone: (212) 763-0883
Facsimile: (212) 564-0883
jdabbs@kaplanhecker.com
shecker@kaplanhecker.com
mferrara@kaplanhecker.com
jthen@kaplanhecker.com

*Counsel for Greg Dwyer*