

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

November 2, 2022

**BY ECF, E-MAIL, and HAND**

The Honorable John G. Koeltl
United States District Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

      Re: *United States v. Gregory Dwyer*, 20 Cr. 500 (JGK)

Dear Judge Koeltl:

      The Government respectfully submits this letter in advance of the sentencing of defendant Gregory Dwyer, currently scheduled for November 10, 2022, at 4:30 p.m., and in response to the defendant's sentencing memorandum ("Def. Mem").

      Gregory Dwyer was a high-ranking employee at BitMEX for about five years. He earned hundreds of thousands of dollars a year from his employment there, where he helped the company willfully operate in violation of the Bank Secrecy Act ("BSA"), by failing to implement an anti-money laundering ("AML") program. During the charged period, as BitMEX grew to become one of the largest cryptocurrency derivatives platforms in the world, the defendant participated in BitMEX's ongoing decision to allow its users to transact trillions of dollars anonymously, without implementation of a know-your-customer ("KYC") process. Over the course of the charged period, Dwyer learned that BitMEX's customers included nefarious actors using the platform for illegal purposes, but took no steps to actually implement a KYC or AML program.

      As the Court knows, the Government initially requested an above-Guidelines sentence of incarceration for Arthur Hayes. On May 20, 2022, the Court instead sentenced Hayes to a sentence of two years' probation, with the first six months to be served on home detention. The Court subsequently imposed sentences of 30 months' probation on Ben Delo and 18 months' probation on Samuel Reed. The Government respectfully requests that the Court impose on Dwyer a Guidelines sentence, namely a sentence of one year probation, given the seriousness of the conduct, the need to promote respect for the law, and to afford adequate deterrence.

## I.      Dwyer's Conduct

### A.  Background of BitMEX

As the Court is aware, Hayes, Delo and Reed founded BitMEX in about 2014, and collectively owned the vast majority of the Company during the charged period. (Presentence Investigation Report ("PSR") ¶ 14).  Dwyer was the Company's first employee, beginning his relationship with BitMEX in about October 2015.  At relevant time periods, Dwyer's title was Head of Business Development.  (PSR ¶ 66).  During applicable periods from BitMEX's launch to at least in or about October 2020, the Company offered financial derivatives, including futures contracts and swaps, tied to the price of Bitcoin and other cryptocurrencies, which settled in Bitcoin. (PSR ¶¶ 14–15). Because BitMEX operated in the United States, including through offering its products to U.S. customers and operating offices in the United States, the Company was a futures commission merchant ("FCM"), which is required under the Commodity Exchange Act ("CEA") to register with the Commodity Futures Trading Commission ("CFTC"), and is a financial institution which must comply with the Bank Secrecy Act.  (PSR ¶ 15). From its launch in 2014, BitMEX acted in willful violation of the BSA.  Just before Dwyer joined the Company, the CFTC issued regulatory orders announcing its view that cryptocurrency is a commodity. Thereafter, the BitMEX defendants, including Dwyer, understood that operation in the United States without an AML program was unlawful.

Dwyer played an important role at BitMEX, particularly in terms of the Company's customer base.  As Head of Business Development, Dwyer had management authority over business development and interfaced directly with customers, including customers in the United States.  (PSR ¶ 66). Dwyer was also a member of BitMEX's advisory committee, which meant he participated in policy-making for the Company. (PSR ¶ 66).  Dwyer's authority included influence over decisions about which users were allowed on the platform and what degree of identity verification BitMEX applied to its users, though he never had a role that included responsibility for corporate compliance. (PSR ¶ 66).  The Government agrees that unlike Hayes and Delo, both of whom owned approximately 30% of the Company, Dwyer was not a leader of the criminal conduct engaged in by BitMEX, since he owned just a small portion of the Company and did not have a C-suite title. (PSR ¶ 64).

Since he began working at the Company, BitMEX, with Dwyer's knowledge and participation, flaunted its avoidance of KYC requirements.  In its earliest days, BitMEX advertised that it did not perform know-your-customer checks. In about 2015, the website advertised that "No real name or other advanced verification is required on BitMEX." (PSR ¶ 23).  Until at least August 2017, BitMEX's registration page required users to provide a username, email address, and password; but explicitly stated that first and last name were "not required" to register and were only "used for verification purposes if you lose your two-factor auth[entication]" for account login. While that language on BitMEX's website was later removed, BitMEX still did not require users to verify their identities until after the Indictment was unsealed.  Dwyer himself periodically emailed inquisitive customers that the Company did not require KYC to trade on the platform.

### B.  Dwyer Understood, and Wilfully Defied, U.S. Law

Dwyer, along with the other BitMEX defendants, followed global regulation of cryptocurrency, particularly from the United States, very closely.  Those regulations guided BitMEX's business decisions.  In September 2015, BitMEX implemented a policy that putatively restricted U.S. customers.  When Dwyer began working at BitMEX, he understood that this policy was in place because BitMEX could not operate in the United States without a KYC program.  For instance, in January 2016, Dwyer received an email from Hayes linking BitMEX's putative U.S. user ban with the need to comply with "CFTC regs," and he sent and received messages via WhatsApp in September and October 2018 about how CFTC enforcement actions connected to the BSA could affect BitMEX. As Dwyer admitted in his allocution, he understood that BitMEX's putative "policy prohibiting U.S. residents from trading on the platform" was "due to U.S. regulatory obligations." (PSR ¶ 71).

Given the choice between complying with the BSA or withdrawing from the United States, Dwyer's co-defendants claimed to choose the latter: the Company put a notice on BitMEX's website and in its terms of service stating that U.S. customers were forbidden from creating accounts, and restricted individuals from creating an account using an internet protocol ("IP") address from the United States. (PSR ¶ 17).[1] But as Dwyer knew once he began working there, this was nothing more than deceptive window-dressing.  Dwyer knew that the putative controls were easily evaded, and he took no steps to encourage the Company to comply with the BSA or take simple steps to restrict more U.S. customers from accessing the platform.

In particular, Dwyer knew U.S. customers continued to access BitMEX through several means. He knew that the Company did not actually bar U.S. IP addresses from the platform. Instead, BitMEX only ran a single IP address check when new users created accounts, even though Dwyer knew that users could easily avoid the initial check, including by using virtual private network services ("VPN") and then make subsequent logins from U.S. IP addresses. (PSR ¶ 32). He knew that BitMEX intentionally marketed to U.S. customers, including through Hayes' appearances on U.S. media outlets and through the BitMEX affiliate user program. (PSR ¶¶ 38–40).  He intentionally allowed some users who he personally knew were U.S. persons to access and trade on BitMEX's platform openly. (PSR ¶ 30). Finally, as defendant Hayes acknowledged, users whose accounts were closed because they had been flagged as from the United States could still open a new account, even if they used the exact same email address as the closed account. Hayes Mem. at 14 n.9.

Dwyer had direct insight into the Company's continued offerings to U.S. customers; indeed, he tracked it.  In July 2017, he compiled and circulated a report that showed that the "United States remains the most popular country by visits and average number of active users per day." (PSR ¶ 21).  Subsequent monthly revenue reports continued to show the presence of U.S. users on BitMEX. (PSR ¶¶ 27, 28).

---

[1]  Indeed, while BitMEX purported to withdraw from the United States, Dwyer and others continued to work in the United States while carrying out their duties, and BitMEX had numerous other employees physically present in the U.S., including from the office in Manhattan where Dwyer frequently worked.

As Dwyer admits, while he knew that allowing these users meant that BitMEX was subject to U.S. law including the BSA, Dwyer and the other BitMEX defendants never required all users to provide their real names and identification documents until after the unsealing of the Indictment, and he took no steps to encourage implementation of such controls.  Def. Mem. at 1, 6.  The Company also filed no SARs with the Department of Treasury between its launch and the unsealing of the Indictment, despite ample knowledge of suspicious activities.

### C.  BitMEX was a Tool for Criminal Activity

As a result of Dwyer and his co-conspirators' decisions not to implement an AML program, BitMEX became a magnet for money laundering and criminal activity.  Significantly, Dwyer knew of many of the suspicious activities, and did nothing thereafter to implement an AML program that could have stopped such conduct in the future. Because BitMEX did not require KYC, the full scope of criminal conduct on BitMEX will never be known.[2] And Dwyer made certain decisions not to assist law enforcement: for instance, in September 2018, a paralegal at the Manhattan District Attorney's Office emailed BitMEX Support asking how to serve BitMEX with a subpoena. After apparent discussion with BitMEX's corporate counsel, Dwyer wrote internally that he was "Silently closing" the request, which ensured that no one responded to the paralegal.

### D.  Dwyer Participated in Lies to Financial Institutions About BitMEX's Operations

Dwyer also participated in a series of false statements to institutions by senior BitMEX staff to support BitMEX's operations. From in about 2016 through at least 2018, Hayes, Delo, and others at the Company made a series of false statements and submitted false documents to the Hong Kong branch of HSBC regarding Shine Effort, a BitMEX affiliate. Hayes, Delo, and other BitMEX employees told HSBC that Shine Effort was actually independent and owned by Delo, with no connection to cryptocurrency. This was false. These false statements were designed to allow BitMEX access to bank accounts for payment of various corporate expenses and make U.S. dollar wire transfers. (PSR ¶ 50). Delo, Hayes, and the others conspired to make these misrepresentations because of their belief that were HSBC to learn the truth, the bank would decline to allow Shine Effort to open a bank account, or later that HSBC would close the account.  For similar reasons, beginning in May 2017, Hayes made false statements to cryptocurrency company SFOX about the nature of Shine Effort.  Dwyer knew that his conspirators were making false statements to the bank and exchange, and worked with BitMEX staff to try to obtain false documents to support these lies. As described in the PSR, Dwyer was

---

[2]  While the full scope may never be known. as the Court is aware, BitMEX accepted a settlement with the Department of Treasury's Financial Crimes Enforcement Network ("FinCEN") in which it neither admitted nor denied FinCEN's finding that it had conducted more than $200 million in suspicious transactions, and that the Company had failed to file SARs on nearly 600 specific suspicious transactions. (PSR ¶ 23); FinCEN Announces $100 Million Enforcement Action Against Unregistered Futures Commission Merchant BitMEX for Willful Violations of the Bank Secrecy Act, *available at* https://www.fincen.gov/news/news-releases/fincen-announces-100-million-enforcement-action-against-unregistered-futures.

involved in an effort to obtain a modified contract from a BitMEX counterparty that removed references to cryptocurrencies, for purposes of deceiving HSBC.  (PSR ¶ 59).

## II.      Procedural History

On October 1, 2020, the Indictment was unsealed.  On October 20, 2021, Dwyer was extradited to the United States from Bermuda and arrested in the Southern District; he was released on bail, which included the ability to travel back to Bermuda.  After pre-trial motion practice, Dwyer entered a plea of guilty to Count One of the Indictment, violating the Bank Secrecy Act, in violation of Title 31, United States Code, Sections 5318 and 5322; and Title 31, Code of Federal Regulations, Sections 1026.210 and 1026.220.  Under his plea agreement, Dwyer agreed to a criminal fine of $150,000.  He is the final defendant to be sentenced in this case; as noted above, Arthur Hayes was sentenced to two years probation, with six months' home detention; Benjamin Delo to 30 months' probation; and Samuel Reed to 18 months' probation.

## III.     Presentence Investigation Report

The Probation Office has calculated the offense level as follows, and as consistent with the plea agreement: (1) pursuant to U.S.S.G. § 2S1.3(a)(1), the base offense level is 8; (2) two levels are removed for acceptance of responsibility, so the specific offense level is 6. (PSR ¶¶ 72–81). The defendant has no criminal history points, and is in Criminal History Category I.

This offense level and criminal history category lead to a Guidelines range of 0 to 6 months' imprisonment. (PSR ¶ 114.) The Government agrees with the Probation Office's calculation.

Probation has recommended a sentence of one year probation, along with the already transferred $150,000 fine.  (PSR p. 34–39). This recommendation is based on Dwyer's lack of criminal history, the non-violent nature of the offense, and the fact that Dwyer did not own a substantial share of BitMEX or otherwise control its day-to-day operations or policies.  Probation also cites to the $150,000 fine the defendant will pay in this case.

## IV.     A Sentence of One Year Probation and the $150,000 Fine is Appropriate Under the 3553(a) Factors

The Government respectfully requests that the Court impose a sentence of one year probation on Dwyer, consistent with the recommendation from the Probation Department in the PSR, along with the agreed-upon $150,000 fine. In response, Dwyer requests a time served sentence, with no term of probation. But such a sentence would be inadequate under the relevant Section 3553 factors.

*Seriousness of the Offense*

A sentence with a term of probation is merited because of the seriousness of the offense. Dwyer participated in criminal activity at the Company he worked at for half a decade. Dwyer ignored the BSA and willfully circumvented it, which meant that BitMEX allowed numerous

cryptocurrency users to launder money without providing their true identities.  Dwyer was highly compensated for his work at this Company Similarly, in a further effort to maximize the Company's revenues at the expense of financial integrity, Dwyer knew that senior BitMEX leadership was lying to HSBC, and participated in those lies.

### Need to Avoid Unwarranted Disparities

A sentence that includes a one-year term of probation—as opposed to time served—is also appropriate to avoid unwarranted disparities.  A time served sentence would lead to an unwarranted disparity compared with his co-defendants.  The Government agrees that Dwyer is less culpable than his co-defendants—while he maintained a high-level position at the Company, he did not own a meaningful portion of BitMEX and did not have direct authority over BitMEX's criminal actions. But there is no question that he is actively participated in willfully violating the law and is thguilty of a serious crime.  As described above, Dwyer knew BitMEX could not offer its products to U.S. customers without an AML program, yet enabled the Company to do so, including by specifically exempting preferred users to trade from the United States.  Further, like his co-defendants, Dwyer was included on some of the dozens of law enforcement inquiries that BitMEX received, yet continued to willfully and intentionally avoid implementing any AML or KYC.  And as described above, Dwyer worked with his co-conspirators to lie to a financial institution about the true nature of BitMEX's business.  A sentence of one year probation would reflect Dwyer's lesser culpability, since it would be the shortest period of probation, but properly reflect his willful criminal conduct and critical role at BitMEX.

### Promote Respect for the Law and Afford Adequate Deterrence

A probationary sentence is also necessary to promote respect for the law and to afford adequate specific and general deterrence. The defendant willfully defied U.S. law for years.  The time-served sentence with no other penalty that he requests would send an inadequate message to both the defendant, an experienced professional in financial services, and others at financial institutions and cryptocurrency companies, about the consequences to high-ranking employees who commit such offenses.

### History and Characteristics of the Defendant

Finally, a sentence of probation is also appropriate given Dwyer's history and characteristics.  Dwyer was well-trained in financial services, who could have used those skills for many lawful occupations. Instead, he decided to engage in lucrative yet unlawful conduct for years.

### Dwyer's Sentencing Memorandum

Dwyer requests a time-served sentence, with no period of probation.  That sentence would be insufficient under the Section 3553(a) factors.  For example, while the Government agrees that Dwyer is less culpable than his co-defendants, *see* Def. Mem. at 8–10, that factor is already captured by the far lower fine the Government agreed to and only a 12-month term of probation. Nor should the Court countenance Dwyer's attempts to diminish the facts in the PSR that he

participated in the frauds on HSBC and SFOX hatched by Hayes and Delo: the evidence is clear that he "knew that two of his bosses were making misrepresentations regarding Shine Effort" *and* then actively participated in and promoted those misrepresentations. Def. Mem. at 10.[3] Dwyer's argument that no period of probation is required because he "need[] only return to the course his life was on before he became aware of his employer's noncompliance with U.S. law," Def. Mem. at 11, overlooks precisely the conduct at issue: Dwyer became aware of BitMEX's noncompliance years before he was arrested, and yet did nothing to correct those violations despite his important role at the Company and high pay.  Only the opportunity for rehabilitation through a year of probation could possibly ensure his continued commitment to lawful conduct, as well as satisfy the other 3553(a) factors.  Finally, Dwyer asserts that his counsel "are informed that foreign authorities may deem 'time served' to be a custodial sentence," which in turn would implicate collateral immigration consequences in foreign jurisdictions. Def. Mem. at 13.  He cites no statute, legal opinion, or case law to support this position.  There is thus no basis for the Court to credit this statement.

###### V.        Conclusion

For the reasons stated above, the Court should impose a sentence of one years probation, which is necessary to comply with the purposes set forth in 18 U.S.C. § 3553(a).

Very truly yours,

DAMIAN WILLIAMS
United States Attorney

by: /s
        Samuel L. Raymond
        Thane Rehn
        Assistant United States Attorneys
        (212) 637-6519

cc: Counsel for Defendant Gregory Dwyer

---

[3]  The Court should obviously reject Dwyer's wishcasting conclusion that the Supreme Court "may" reject the Second Circuit's still binding decisions regarding the right-to-control theory, which has no relevance to his willful violation of the BSA and does nothing to change the fact that he actively participated in lying to a major financial institution. Def. Mem. at 11.